249 N.J. Super. 597 (1991)
592 A.2d 1251
ESTATE OF WILLIAM BEHRINGER, M.D., PLAINTIFF,
v.
THE MEDICAL CENTER AT PRINCETON, DENNIS DOODY, AND LEUNG LEE, M.D., DEFENDANTS.
Superior Court of New Jersey, Law Division Mercer County.
Decided April 25, 1991.
*604 Roger Bernstein and Jennifer Braun admitted pro hac vice (Vladeck, Waldman, Elias & Engelhard, attorneys) and Karen Honeycutt for plaintiff.
Brian Sullivan and John R. Heher for defendants (Smith, Stratton, Wise, Heher & Brennan, attorneys).
CARCHMAN, J.S.C.
Plaintiff, William H. Behringer,[1] was a patient at defendant Medical Center at Princeton (the medical center) when on June 17, 1987, he tested positive for the Human Immunodeficiency Virus (HIV), and combined with Pneumocystis Carinii Pneumonia (PCP), was diagnosed as suffering from Acquired Immunodeficiency Syndrome (AIDS). At the time, plaintiff, an otolaryngologist (ENT) and plastic surgeon, was also a member of *605 the staff at the medical center. Within hours of his discharge from the medical center on June 18, 1987, plaintiff received numerous phone calls from well-wishers indicating a concern for his welfare but also demonstrating an awareness of his illness. Most of these callers were also members of the medical staff at the medical center. Other calls were received from friends in the community. Within days, similar calls were received from patients. Within a few weeks of his diagnosis, plaintiff's surgical privileges at the medical center were suspended. From the date of his diagnosis until his death on July 2, 1989, plaintiff did not perform any further surgery at the medical center, his practice declined and he suffered both emotionally and financially.
Plaintiff brings this action seeking damages for: (1) a breach of the medical center's and named employees' duty to maintain confidentiality of plaintiff's diagnosis and test results, and (2) a violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., as a result of the imposition of conditions on plaintiff's continued performance of surgical procedures at the medical center, revocation of plaintiff's surgical privileges and breach of confidentiality. Defendant denies any breach of confidentiality and asserts that any action by the medical center was proper and not a violation of N.J.S.A. 10:5-1 et seq.
This case raises novel issues of a hospital's obligation to protect the confidentiality of an AIDS diagnosis of a health-care worker, as well as a hospital's right to regulate and restrict the surgical activities of an HIV-positive doctor. This case addresses the apparent conflict between a doctor's rights under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., and a patient's "right to know" under the doctrine of "informed consent." This case explores the competing interests of a surgeon with AIDS, his patients, the hospital at which he practices and the hospital's medical and dental staff.
*606 After a bench trial and consideration of the evidence presented, this court makes findings of fact and conclusions of law as set forth below.
To summarize, this court holds:
1. The medical center breached its duty of confidentiality to plaintiff, as a patient, when it failed to take reasonable precautions regarding plaintiff's medical records to prevent plaintiff's AIDS diagnosis from becoming a matter of public knowledge.
2. Plaintiff, as an AIDS-afflicted surgeon with surgical privileges at the medical center, was protected by the Law Against Discrimination. N.J.S.A. 10:5-1 et seq.
3. The Medical Center met its burden of establishing that its policy of temporarily suspending and, thereafter, restricting plaintiff's surgical privileges was substantially justified by a reasonable probability of harm to the patient.
4. The "risk of harm" to the patient includes not only the actual transmission of HIV from surgeon to patient but the risk of a surgical accident, i.e., a scalpel cut or needle stick, which may subject the patient to post-surgery HIV testing.
5. Defendant medical center, as a condition of vacating the temporary suspension of plaintiff's surgical privileges, properly required plaintiff, as a physician with a positive diagnosis of AIDS, to secure informed consent from any surgical patients.
6. The medical center's policy of restricting surgical privileges of health care providers who pose "any risk of HIV transmission to the patient" was a reasonable exercise of the medical center's authority as applied to the facts of this case, where plaintiff was an AIDS-positive surgeon.[2]

I.

A.
Plaintiff, a board-certified ENT surgeon, developed a successful practice during his ten years in the Princeton area. His practice extended beyond the limited area of ear, nose and throat surgery and included a practice in facial plastic surgery. He served as an attending physician at the Medical Center since 1979 and performed surgery at the medical center since 1981.
*607 In early June 1987, plaintiff felt ill. He complained of various symptoms and treated himself. Acknowledging no improvement, plaintiff consulted with a physician-friend (the treating physician). On June 16, 1987, plaintiff's companion arrived at plaintiff's home and observed that plaintiff was in distress. A call was made to the treating physician, and at approximately 11:00 p.m., plaintiff and his companion proceeded to the medical center emergency room, where plaintiff was examined initially by a number of residents and, thereafter, by the treating physician. The treating physician advised plaintiff that a pulmonary consultation was necessary, and a pulmonary specialist proceeded to examine plaintiff. A determination was made to perform a bronchoscopy  a diagnostic procedure involving bronchial washings  to establish the existence of PCP, a conclusive indicator of AIDS. The pulmonary consultant assumed that plaintiff, as a physician, knew the implications of PCP and its relationship to AIDS. In addition, the treating physician ordered a blood study including a test to determine whether plaintiff was infected with HIV  the cause of AIDS.
Plaintiff's companion has no recollection of specific information being transmitted to plaintiff regarding the HIV test, nor does she recollect any specific "counselling" or explanation being given to plaintiff about the significance, impact or confidentiality of a positive result of the HIV test. While the companion specifically denies any direct conversation between plaintiff and his doctors regarding the HIV test, the pulmonary consultant indicated that during his conversation with plaintiff, the pulmonary consultant discussed PCP as one of a number of possible diagnoses resulting from the test. Plaintiff was admitted to the medical center that evening.
Conforming to medical center policy, plaintiff executed a consent form granting to the pulmonary consultant the general consent to perform a bronchoscopy. In addition, plaintiff executed a special consent form granting specific consent to perform an HIV blood test. During the morning of June 17, 1987, plaintiff submitted to a bronchoscopy and returned to his room *608 in the afternoon, where he was described as "sedated" and "out of it." Later that day, the pulmonary consultant reported to plaintiff that the results of the tests were positive for PCP, and he concluded that this information was new to plaintiff. Early that evening, the treating physician returned to plaintiff's room, and in the presence of plaintiff's companion, informed plaintiff that the HIV test was positive. Plaintiff was also informed that he had AIDS. Plaintiff's reaction, according to plaintiff's companion, was one of shock and dismay. His emotions ranged from concern about his health to fear of the impact of this information on his practice. Plaintiff's companion described her initial response as "who else knew?" The treating physician responded that he had told his wife; both plaintiff and his companion, close personal friends of both the treating physician and his wife, responded that "they understood."
It was readily apparent to all persons involved at this point that plaintiff's presence in the medical center was cause for concern. An infectious disease consultant and staff epidemiologist suggested to plaintiff that he transfer to Lenox Hill Hospital in New York or other available hospitals in the area. After inquiry, it was determined that no other beds were available. This concern for an immediate transfer appeared to be two-fold  to insure the best available treatment for plaintiff (the treating physician suggested that AZT treatment be considered) and to prevent plaintiff's diagnosis from becoming public. It is apparent that all parties involved to this point  plaintiff, the treating physician, the epidemiologist and plaintiff's companion  fully understood the implications of the AIDS diagnosis becoming a matter of public knowledge. A determination was made that plaintiff would leave the hospital and be treated at home. Plaintiff was discharged from the hospital on the afternoon of June 18, 1987. To minimize the significance of his condition, plaintiff walked out of the hospital rather than following the normal medical center practice of being wheeled out.
*609 Plaintiff's concern about public knowledge of the diagnosis was not misplaced. Upon his arrival home, plaintiff and his companion received a series of phone calls. Calls were received from various doctors who practiced at the medical center with plaintiff. All doctors, in addition to being professional colleagues, were social friends, but none were involved with the care and treatment of plaintiff. All indicated in various ways that they were aware of the diagnosis. Statements were made either directly to plaintiff's companion or by insinuation, such as an inquiry as to whether the companion was "tested." She did not deny references to the diagnosis but admits that she "tacitly acknowledged the diagnosis in one instance by silence." During the evening of June 18, she received a call from social non-medical friends who indicated their knowledge of the diagnosis and expressed support to her and plaintiff. She indicated that the relationships with various neighbors and friends changed as a result of the diagnosis. There was less social contact and communication and what she perceived as a significant diminution in the popularity of plaintiff.
Plaintiff's condition and the growing awareness of that condition in the community impacted upon not only plaintiff's social relationships but, more significantly, on his practice as well. In July 1987, plaintiff returned to his office practice. During his short absence from his office and in the ensuing months, calls were received at his practice from doctors and patients alike who indicated an awareness of plaintiff's condition and in many cases, requested transfer of files or indicated no further interest in being treated by plaintiff. At one point plaintiff's companion instructed Jeannie Weinstein, plaintiff's receptionist, not to confirm any information regarding AIDS, and "instruct patients that plaintiff did not have AIDS." Over an extended period of time, the practice diminished as more of plaintiff's patients became aware of his condition.
Cancellations continued at an exceedingly high rate. The effect of plaintiff's condition was not limited simply to patient relationships, but affected employees as well. As early as June *610 18, 1987, Weinstein, a long-standing employee of plaintiff, received an office telephone call from a local physician inquiring as to whether plaintiff had AIDS. Weinstein responded that she knew nothing about it but, thereafter, met with other employees in the office and told them of the phone call. During the two-week period after this call, some 15 to 20 calls were received from various patients indicating knowledge of plaintiff's condition. An extensive list was prepared by Weinstein indicating cancellation of appointments and patient requests for records. The list, for reasons not sufficiently explained, was kept only until September 1987, when the listing stopped. During this period, three employees left plaintiff's employ and a replacement employee left one day after being hired upon learning that plaintiff had contracted AIDS. During the two years following his AIDS diagnosis, plaintiff suffered from an ulcer, was hospitalized for one week for a virus, and as a result of his AIDS condition, lost sight in one eye. Plaintiff continued in an office practice until his death on July 2, 1989.

B.
The medical center's reaction to plaintiff's condition was swift and initially precise. Upon learning of plaintiff's diagnosis from the chief of nursing, the president of the medical center, defendant Dennis Doody (Doody), immediately directed the cancellation of plaintiff's pending surgical cases. This initial decision was made with little information or knowledge of potential transmission of the disease; thereafter, the chairman of the department of surgery, having privately researched the issue, reached a contrary result and urged that plaintiff could resume his surgical practice. The medical center procedure for suspending a physician's surgical privileges provides for summary suspension by a vote of the department chair, president of the medical center, president of the medical and dental staff, chairman of the board of trustees, and the physician in charge of the service. While Doody was defeated in a vote for summary suspension, the surgery remained cancelled, *611 and the matter was ultimately brought before the board of trustees.
Doody's motivation in seeking the suspension of surgical privileges was described as one of concern for patients but also, and perhaps more important, concern for the medical center and its potential liability. Little was known about the dilemma now facing the medical center. In any event, plaintiff's surgical privileges were cancelled and would never, during plaintiff's life, be reinstated.
During the ensuing months, the medical center embarked on a torturous journey which shifted course as views were explored and, ultimately, a consensus reached between the medical and dental staff, hospital administration and the board of trustees.
On July 2, 1987, plaintiff privately informed the chairman of the department of surgery at the medical center of his medical condition. Plaintiff felt that the chairman of his department should know of his health status and informed the chair that plaintiff wished to continue to practice, including performing surgery.
Doody called a special meeting of the executive committee of the medical and dental staff which took place on July 13, 1987. The medical and dental staff is a body of physicians and dentists operating under the aegis of the board of trustees of the hospital. The board approves the staff's by-laws and retains ultimate decision-making authority. At this meeting, the executive committee passed a motion holding that "HIV positivity alone is not a reason for restricting a Health Care Worker from [the performance of] invasive procedures on the basis of data currently available." Defendant Doody, the lone dissenter, admittedly presented no scientific or medical basis for disagreeing with the committee's recommendation. Both the medical literature from the centers for disease control (CDC) and other authorities that were discussed, as well as defendant medical center's staff epidemiologist noted that there *612 were no known cases of transmission of HIV from a health care worker (HCW) to a patient. Later, however, the epidemiologist recommended to defendant Doody that an HIV-infected surgeon should not operate. Defendant Doody acknowledged at trial, and believed at the time of the special meeting, that the CDC was "the number one resource on infectious disease in the United States."
A second meeting of the executive committee of the medical and dental staff was held on July 16, 1987 to continue discussing the issues raised by plaintiff's medical condition. The committee maintained its recommendations that, based on all available, current scientific information, a surgeon with AIDS or one who is HIV-positive should retain all of his privileges, be subject to careful monitoring for competence and follow CDC-recommended precautions for invasive procedures. At this meeting, the physicians who were present concluded that there was no risk of transmission that would require an HIV-positive surgeon to disclose that fact to a patient as part of informed consent. However, Doody and the medical center's legal counsel offered the opinion that despite the absence of reported cases of transmission from HCW to patient, a physician's HIV-positive status should be divulged in any informed consent form because of "legal and social considerations." The committee concluded that a full meeting of the board of trustees was necessary to resolve the issue.
A special meeting of the board of trustees was held on July 20, 1987. At this meeting the board of trustees was addressed by the chairman of the department of surgery, the medical center's staff epidemiologist, as well as physicians comprising the executive committee of the medical and dental staff, who reiterated that no cases of HIV transmission from HCW to patient had ever been reported. At the meeting, the issue of informed consent was discussed at length. All members of the board of trustees were provided with a packet of information that included current CDC statements regarding performance of invasive procedures by HCWs and copies of the minutes of *613 the medical and dental staff executive committee meetings, including a letter from the staff to the board setting forth the staff's position. Doody and the board were also informed that CDC-recommended operating room precautions were expected to prevent HIV transmission. The board of trustees was told that the CDC recommended individualized decision-making for HIV-positive HCWs, suggesting that decisions regarding continued practice by an HIV-positive physician should be made on a case-by-case basis. Doody expressed concern about the hospital's reputation as well as potential litigation given public fear of AIDS. After consideration of all of the information presented, the board voted to require the use of a special "informed consent form" to be presented to patients about to undergo surgery by HIV-positive surgeons. The form read as follows:
THE MEDICAL CENTER AT PRINCETON, NEW JERSEY SUPPLEMENTAL CONSENT FOR OPERATIVE AND/OR INVASIVE PROCEDURE
 I have on this date executed a consent, which is
 attached hereto, for (Procedure) 
 _______________________________ to be performed by
 Dr. ____. In addition, I have also been informed by
 Dr. ____, that he has a positive blood test
 indicative of infection with HIV (Human
 Immunodeficiency Virus) which is the cause of AIDS.
 I have also been informed of the potential risk of
 transmission of the virus.
 (witness) (signature of patient) 
All parties recognized that in the absence of patients willing to undergo invasive procedures by HIV-positive surgeons, this was a "de facto prohibition" from surgical practice. Subsequent to the July 20, 1987 meeting of the board of trustees, various committees met as the issues concerning HIV-positivity and HCWs continued to be discussed at the medical center. To further explore the issues, three meetings of the joint conference committee of the board of trustees and the medical and dental staff were held and are especially noteworthy. These *614 meetings occurred on October 29, 1987, November 19, 1987 and December 17, 1987. At the first meeting, the epidemiologist spoke about the medical information available concerning the issue of an HIV-positive surgeon performing invasive procedures. At the second meeting, Robert Cassidy, Ph.D., an ethicist and a member of the faculty of the Robert Wood Johnson Medical School, discussed the legal requirements for informed consent in New Jersey. At the third meeting, Paul Armstrong, Esquire, presented the report of the Council on Ethical and Judicial Affairs of the American Medical Association, which deals with the issue of AIDS in the health care environment. The American Medical Association report contains among its recommendations the following:
The Council's new opinion on PHYSICIANS AND INFECTIOUS DISEASES is:
A physician who knows that he or she has an infectious disease should not engage in any activity that creates a risk of transmission of the disease to others.
In the context of the AIDS crisis, the application of the Council's opinion depends on the activity in which the physician wishes to engage.
The Council on Ethical and Judicial Affairs reiterates and reaffirms the AMA's strong belief that AIDS victims and those who are seropositive should not be treated unfairly or suffer from discrimination. However, in the special context of the provision of medical care, the Council believes that if a risk of transmission of an infectious disease from a physician to a patient exists, disclosure of that risk to patients is not enough; patients are entitled to expect that their physicians will not increase their exposure to the risk of contracting an infectious disease, even minimally. If no risk exists, disclosure of the physicians's medical condition to his or her patients will serve no rational purpose; if a risk does exist, the physician should not engage in the activity.
Armstrong concluded his remarks by stating that the above provided a standard with regard to HCWs with HIV seropositivity or AIDS which had not existed prior to its promulgation.
At the conclusion of the meeting on December 17, 1987, it was suggested that if the board of trustees was to change its policy regarding HIV-positive surgeons, the impetus for such change should come from the medical and dental staff. The president of the medical and dental staff agreed that the issue would be addressed at the January meeting of the staff's executive committee.
*615 At its January 25, 1988 meeting, the staff's executive committee, after lengthy discussion, recommended that the following policy be adopted by the board of trustees:
1. The Medical Center at Princeton Medical and Dental Staff will continue to care for patients with AIDS without discrimination.
2. A physician or Health Care provider with known HIV seropositivity will continue to treat patients at the Medical Center at Princeton, but will not perform procedures that pose any risk of virus transmission to the patient.
This policy was proposed to the entire medical and dental staff, and on February 11, 1988, a meeting of the full medical and dental staff was held, at which time this new policy regarding HIV seropositive surgeons was discussed. A recommendation was forwarded to the board of trustees that this two-part policy be adopted.
On June 27, 1988, the board of trustees met and, after questions and discussions, adopted the following policy for HIV seropositive health care workers:
POLICY FOR HIV SEROPOSITIVE HEALTH CARE WORKERS
1. The Medical Center at Princeton Medical and Dental Staff shall continue to care for patients with AIDS without discrimination.
2. A physician or health care provider with known HIV seropositivity may continue to treat patients at The Medical Center at Princeton, but shall not perform procedures that pose any risk of HIV transmission to the patient. [Emphasis supplied]
This policy included a procedure for the recredentialling of physicians.[3] Although the policy was adopted, the board did *616 not change its prior requirement that a physician obtain written informed consent from the patient prior to the performance of surgical procedures.
Plaintiff's privileges, as a "potential risk," were ultimately suspended under this policy, and no action was taken by him challenging the policy or seeking recredentialling under the policy.
Following his diagnosis of AIDS, plaintiff never again performed surgery at the medical center.

C.
The administration of plaintiff's blood test, resulting in a finding of HIV positivity, warrants a critical examination of the testing procedures and efforts made by medical center to insure confidentiality of results.
In 1985, the medical center began testing blood for HIV seropositivity for its blood bank. Since HIV testing was available for blood donors, HIV testing was also made available to staff physicians, both for inpatients and outpatients. Initially, the reporting procedures for both inpatients and outpatients required the physician to submit the blood to the laboratory with only a code number. After the test was completed, the results were returned to the physician under the code number, without the patient's name. This procedure was approved by the New Jersey Department of Health. The testing procedure was administered by the department of laboratories under the direction of defendant Leung Lee, M.D. (Lee) and the actual responsibility for implementation of the procedure was delegated to Ilana Pachter, M.D., at that time an employee of medical center.
*617 By 1986, many hospitals began to realize that the established procedures were unworkable for inpatients. In 1986, a meeting was held by the New Jersey Department of Health, which was attended by representatives of many New Jersey hospitals, including Pachter of the medical center. The consensus at the meeting was that inpatient testing could not be conducted under a code-number system for a variety of reasons including lack of cooperation by members of the medical staff. In addition, it was felt that HIV positive status was an important medical fact that should be included within a patient's medical chart.
In response to this meeting, the department of health issued new guidelines in October 1986 dealing with the reporting of HIV results for hospital inpatients. The new guidelines included the following:
1) Testing facilities must make reasonable efforts to maintain confidentiality.
2) For in-patients and clinic out patients, specimens may be received with the patient's name on them. These specimens must be encoded, (e.g., assignment of lab I.D. numbers) in the laboratory before testing occurs, so that test results do not appear with the patient's name in the laboratory's work records. The results of these assays may be placed on the patient chart in the same manner as other routine tests.
These stated procedures were designed to recognize and deal appropriately with the issue of confidentiality. While health care facilities recognized the need for confidentiality, an additional, yet critical, element of HIV-test protocol required communication with the patient. This communication took the form of pre-test counselling of patients prior to the administration of the HIV test.
Pre-test counselling for HIV blood tests has been the standard of practice since the beginning of HIV testing. Such counselling includes discussion about the disclosure of test results and an identification of those having access to test results. Before HIV tests are given, patients are counselled as to the privacy and confidentiality implications of being identified as HIV-infected. These implications are explained to symptomatic and asymptomatic patients alike. Members of the *618 medical center's department of laboratories attended New Jersey Department of Health seminars prior to June 1987, at which pre-test counselling was addressed.
Pre-test counselling was not a procedure limited to New Jersey. It was recommended by public health authorities, including the CDC prior to June 1987. In 1987, accepted medical practice called for patient counselling concerning, inter alia, privacy and confidentiality prior to obtaining consent for an HIV test.
While no question was raised at trial that the responsibility for pre-test counselling appropriately rested with the treating physician, the record is devoid of any suggestion that any pre-test counselling of plaintiff, either in oral or written form, took place during the period June 16 to June 18, 1987. While plaintiff was, by profession, a physician, he was, during this period, a patient at the medical center. No one in this litigation suggests that plaintiff was not entitled to all of the protections afforded any other patient. The informed consent form promulgated by the department of laboratories at the medical center and signed by plaintiff, does little to correct this apparent deficiency. The form provides as follows:
CONSENT FORM ....
I William Behringer hereby give my consent to the Medical Center at Princeton to have my blood tested for antibodies to HTLV III Virus as ordered by my physician. The results of the test will be reported only to the ordering physician.
 Date 6/17/87 Patient signature (s)William
 Behringer
 Witness (illegible)
 PATIENT CODE NO. 865353
The test was ordered by the treating physician on admission and administered sometime on June 17, 1987. The informed consent form indicated a time of 1:00 p.m. At approximately 2:00 p.m., the infectious disease specialist went to the department *619 of laboratories at the medical center to determine the status of plaintiff's HIV blood test. Upon learning that the test had not been conducted, the infectious disease specialist asked Lee to conduct the test on an expedited basis. Lee agreed and instructed the blood bank supervisor to conduct the test as soon as possible. Plaintiff's name was identified to the supervisor by the infectious disease consultant and Lee. Since plaintiff's blood sample was already in the lab, the sample had been given a code number, and plaintiff's name was removed from the sample. Plaintiff's name and code number had been placed in a locked filing cabinet pursuant to laboratory procedures. The supervisor went to the locked file cabinet, looked up plaintiff's name and obtained the code number for his blood sample. The blood sample was then located by reference to the code number and was given to a laboratory technician with instructions to conduct the HIV test. This occurred sometime between 2:30 and 3:30 p.m. The technician was not provided with the name of the patient for whom the HIV test was being conducted.
Since the technician left work at 3:30 p.m. each day and since the test takes approximately four hours, she did not conclude the test and thus did not learn the results. The test was concluded by the supervisor at approximately 6:00 p.m., at which time the results, which were positive, were relinked to plaintiff's name in the record maintained in the locked file cabinet pursuant to the standard procedures followed by the department of laboratories.
Prior to the test, the infectious disease specialist who had requested the test be conducted asked Lee to telephone him with the results as soon as they became available. Accordingly, Lee instructed the supervisor to telephone him at home with the results as soon as they were available.
Early that evening, the supervisor called Lee at home and informed him that plaintiff's HIV test was positive. As he had *620 been instructed, Lee called the infectious disease specialist and advised him of the results.
During the late afternoon or early evening of June 17, 1987, after receiving the positive HIV results, the infectious disease specialist spoke with plaintiff and suggested he might want to seek treatment at another hospital to protect his confidentiality. Later, the infectious disease specialist attempted without success to arrange for the transfer of plaintiff to either Lenox Hill Hospital or Columbia Presbyterian Hospital in New York City.
On June 18, 1987, pursuant to normal procedures, the department of laboratories ran a follow-up confirmation HIV test. The result was again positive and a preprinted form was prepared indicating a positive result. The preprinted form was taken by the supervisor and presented to Pachter, who signed it.
Normal procedures within the department of laboratories called for the test result to be taken by a blood-bank technician and hand-carried to the patient's chart and placed in the section of the chart designated for laboratory results. All other laboratory test results are placed in the patient's medical chart by clerical personnel. This special procedure for HIV test results was implemented by the department of laboratories as an additional safeguard for patient confidentiality.
The above procedure was not immediately carried out but was delayed in an effort to protect plaintiff's confidentiality. In a telephone conversation during the afternoon of June 18, the treating physician and Pachter agreed that since plaintiff was to be discharged from the medical center late that afternoon, the HIV test results should be held back and charted as late in the day as possible. Therefore, consistent with the agreement reached with the treating physician, Pachter instructed the supervisor to hand-carry the result to the patient's chart just before she left for the day.
Since the supervisor worked until 4:30 p.m. each day, she believes that she took the HIV-positive result to plaintiff's *621 chart sometime between 4:15 and 4:30 p.m. on June 18, 1987. Upon arriving at the nurses' station on plaintiff's floor, the supervisor was unable to locate the chart. She asked the nurse on duty for the chart, at which time the nurse went to plaintiff's hospital room, obtained the chart and delivered it to the supervisor. She, without commenting on the HIV test or the results, placed the test results in the section of the chart designated for laboratory results.
At approximately 4:30 p.m. on June 18, 1987, plaintiff was discharged from the medical center.
The implications of charting the results of the HIV test were well recognized. Both Lee and the infectious disease specialist discussed the acute need to keep the test results confidential and even went so far as to affirmatively determine not to disclose the results to Doody; moreover, the charting was withheld by design until plaintiff left the hospital.
While there is some dispute as to the propriety of charting as an acceptable medical practice, the medical center felt there were safeguards in the general confidentiality guidelines set forth in its by-laws and employee manuals. According to stated policy, charts were limited to those persons having patient-care responsibility, but in practical terms, the charts were available to any doctor, nurse or other hospital personnel. Despite the CDC's recommendation that access to HIV results be limited, the medical center had no policy physically restricting access to the HIV test results or the charts containing the results to those involved with the particular patient's care. In addition, the broad confidentiality policies of the medical center specifically restrict HCWs from discussing patient's charts with other HCWs.
The employees of the medical center were not given any instructions advising them of the confidentiality of HIV test results. The department of laboratories of the medical center took no steps to ensure that HIV test results were kept confidential by other departments of the medical center after *622 being placed in patient charts. Under Lee, the department of laboratories ran no confidentiality training programs despite the fact that it was responsible for HIV testing.
Plaintiff's medical chart was kept at the nurses' station on the floor on which plaintiff was an inpatient. Not only was the HIV result charted, but his AIDS diagnosis was noted at numerous places therein. No effort was made to keep knowledge of this diagnosis limited to persons involved in plaintiff's care. There was no written or verbal restriction against any HCW involved in plaintiff's care discussing plaintiff's diagnosis with other medical center employees. Employees not involved in his care did learn of plaintiff's diagnosis. Employees of the medical center who had been plaintiff's patients ceased going to him for medical services. Given the significance of a physician-patient with a diagnosis of AIDS and the lack of special procedures directed at securing confidentiality, the inevitable happened. As noted earlier, within hours of the diagnosis, word of plaintiff's illness was "on the street." Any suggestion of subsequent breaches of confidentiality are superfluous.

D.
Plaintiff was diagnosed in June 1987 as having AIDS as a result of the positive HIV blood test and the diagnosis of PCP.
The expert testimony presented by both plaintiff and defendants, while differing significantly as to conclusion, was consistent as to the scientific underpinnings upon which their conclusions about HIV positively and AIDS were based. Both plaintiff's expert, Peter Selwyn, M.D., an epidemiologist and the head of AIDS research at the Montefiore Medical Center in the Bronx, New York, and defendant's expert, Lorraine Day, M.D., an orthopedic surgeon from San Francisco, California, who has been an active spokesperson nationally on the issue of AIDS, based their conflicting opinions on the following common data:

*623 1) A British study revealed that there were 112 needle-stick and scalpel cuts in 2,000 reported operations, (5%).[4]
2) The CDC has reported nine cases of transmission of HIV from patient to HCW.
3) A risk of transmission of HIV from HCW to patient of 0.5% or less is a quantifiable risk.
4) As of June 1989, the date of plaintiff's death, there was no reported case of transmission of HIV from HCW to patient.
5) Once contracted, AIDS is fatal usually within two years.
As to the effect of these studies and facts, the experts sharply disagree. Selwyn opined that there was no reasonable medical or scientific basis for defendant's decision restricting plaintiff's surgical privileges which, Selwyn claims, was based on unfounded fears of HIV transmission as a potential area for litigation against the hospital.
Selwyn has been extensively involved in the clinical treatment of AIDS, AIDS-related teaching and research, and the development of AIDS-related policy at both the local and global levels. As an assistant professor of epidemiology at Albert Einstein College of Medicine and a physician at Montefiore Medical Center in New York, Selwyn has been responsible for conducting AIDS-related epidemiological studies, and has personally cared for several hundred patients with HIV infection or AIDS. He has participated in the formation of hospital policies and hospital training programs concerning HIV infection and AIDS, and has studied the nature and risk of HIV transmission. He is well-qualified as an expert in this field.
In his analysis of the issues, Selwyn utilized scientifically accepted information, statistics and health-care facility reactions to the treatment of hepatitis B virus and transmission between patient and HCW.
Hepatitis B, the virus that causes hepatitis, is a blood borne infectious disease transmitted through similar routes as HIV. Selwyn noted that the estimated rate of death among HCWs *624 who contract hepatitis B, which develops into chronic disease in approximately six to ten percent of those cases, is higher than any estimates of HCWs occupationally infected with HIV.
In addition, he stated that for both hepatitis B and HIV, the risk of an HCW transmitting the virus to a patient is substantially less than the risk of a patient transmitting the virus to an HCW. Moreover, the risk of transmission of HIV from an HCW to a patient is even lower than the risk of an HCW transmitting hepatitis B to a patient. The recorded estimates of hepatitis B transmission from physicians to patients have all been based on anecdotal reports and are essentially reduced to situations where breaches in medical technique, such as a dentist's failure to wear gloves, were associated with increased likelihood of blood-to-blood contact. Where such breaches did occur and then precautions were instituted and studied, transmission of hepatitis B did not occur again. The medical center's epidemiologist agreed with Selwyn on this issue. The epidemiologist informed the medical and dental staff and Doody that change in technique would affect the risks of such transmissions.
Hepatitis B is less likely to be fatal but is more readily transmitted than HIV. Selwyn estimated that statistically the risk of death from exposure to a surgeon with HIV would be about the same as that from exposure to a surgeon with hepatitis B. Of critical importance, however, is that of the transmitted diseases, if the HIV infection develops into AIDS, fatality is certain.
While Selwyn noted the similarities between HIV and hepatitis B transmission, he indicated that there were no restrictions placed on hepatitis B-positive doctors performing invasive procedures; however, the record is absent any facts indicating any cases of hepatitis B-positive doctors performing any invasive procedure at the medical center. In this regard, Selwyn did note that such matters as surgeon's wound infection rates or a history of substance abuse would be critical to a patient's *625 knowledge of the risks attendant to a surgical procedure, but no informed consent requirements have been imposed on physicians anywhere which require the physician to inform patients of such risks.
Selwyn observed that even assuming that an HIV-positive physician nicked a finger during surgery and a drop of the physician's blood fell into the patient, the risk of that patient contracting HIV is less than one-half of one percent. Selwyn explained that the actual risk of ultimate transmission is diluted by the probability of a series of events happening, all of which would be necessary before exposure occurs. Whether an injury occurs, whether it occurs within range of the patient's blood, whether the surgeon's blood makes its way out from beneath two layers of gloves, and whether there is then a transmission of the surgeon's blood into the patient's blood, are all independent events that geometrically reduce the chance of blood-to-blood contact. This reduces the less than one-half of one percent chance of infection associated with contact. Day conceded that the chance of all these events occuring in a procedure was.0025%. Selwyn added that the risk factor was affected by the nature of the surgery performed, e.g., orthopedic surgeons or gynecological surgeons operating in some areas by "feel" bear a higher risk of accident than do surgeons such as ENT specialists.
Selwyn's conclusion that the risk of transmission of HIV from an HIV-positive surgeon to a patient is remote was an accepted premise in 1987 at the time defendants learned plaintiff had AIDS.
Selwyn further concluded that no restrictions should have been placed on plaintiff's practice simply because of HIV infection. For situations like plaintiff's, Selwyn recommended that the hospital, department chief, and HIV-positive physician monitor the physician's competence to perform, institute whatever precautions might further reduce the already remote risk of transmission, and discuss the surgeon's techniques and procedures. *626 All parties must be educated as to the actual risk or absence of risk of transmission and discussion and agreement must be private.
Selwyn felt that an informed consent requirement was inappropriate. He testified that while a patient might "want" to know the health status of the physician, the risk was not so significant that a patient would "need" to know the information. He did not feel this was a "risk within a reasonable medical opinion." Selwyn concluded that only risks "within a reasonable medical opinion" were necessarily divulged to a patient.[5] Although internal review by doctors' clinical supervisors has been used satisfactorily in other instances where doctors have medical problems, the medical center took no such steps in this case.
Day's conclusions differed significantly from those of Selwyn, especially in the area of restriction on practice. Day has served as the chief of orthopedic surgery at San Francisco General Hospital. While not an epidemiologist, she has served on numerous AIDS-related committees including the AIDS Task Force of the American Academy of Orthopedic Surgeons. She lacked the training or full understanding of AIDS-related issues that was demonstrated by Selwyn and provided much undocumented statistical information which must be discounted, or in some cases, disregarded. Day, however, did provide some practical insight into a practitioner's concerns about AIDS as applied to both the affected doctor and patient.[6] Day testified that transmission of the disease can occur when HIV-infected *627 blood comes in contact with an intact mucous membrane and, further pointed out that an ENT surgeon performs surgery in the area of an intact mucous membrane. In addition, she noted that much of ENT surgery is performed "blind," making the ENT surgeon a high-risk candidate for surgical nicks or cuts. As a practical matter, she added, surgeons incur needle sticks and other cuts in the operating room on a regular basis, and the wearing of surgical gloves does not protect a surgeon from needle sticks or bleeding into the patient's surgical wound or oral cavity.
Day vigorously disputed Selwyn's conclusion that a patient need not know the surgeon's HIV-positive status. Both Selwyn and Day made reference to recommendation no. 5 in the CDC's recommendations and guidelines concerning AIDS, dated April 11, 1986, which provides:
If an incident occurs during an invasive procedure that results in exposure of a patient to the blood of an HCW, the patient should be informed of the incident, and previous recommendations for management of such exposures should be followed.[7]
While Selwyn accepted recommendation no. 5, Day was highly critical of its application. She indicated that the effect of HIV exposure on a patient would be significant, including periodic HIV testing over a period of at least one year and counselling regarding major lifestyle changes, involving such *628 matters as sexual practices and decisions regarding conceiving children.[8] The impact of the application of recommendation no. 5 would be enormous anxiety and mental anguish, which could be avoided if the patient were advised of the surgeon's condition before the surgery and, obviously, the surgical accident. Day strongly advocated the patient's "need" to know the surgeon's status by use of an informed consent procedure.
The experts differed significantly in the area of confidentiality and the charting of the results of the HIV blood test. *629 Selwyn felt that the charting and dissemination of information from plaintiff's chart, including the results of the bronchoscopy, required special handling. In addition, Selwyn concluded that because of the absence of counselling of plaintiff there was no "informed consent" as to the HIV blood test. Both experts agreed that the responsibility for counselling is an obligation imposed on the treating physician; nevertheless, insuring that counselling takes place and is conducted in an appropriate manner is a responsibility that is shared by the hospital as well.
Selwyn opined that access to the chart should be limited to persons within the "clinical realm" having "a need to know." He noted that the CDC guidelines require universal precautions, i.e., treating all patients as if they were HIV positive  to avoid transmission. If usual precautions are observed, nothing clinically is gained by charting the test results without restriction. In addition, Selwyn felt that the use of special measures to insure confidentiality must be considered when dealing with an HCW. Various alternatives to unrestricted charting of an AIDS diagnosis include charting the HIV result separately or segregating the chart. Day, voicing a contrary position, felt the chart should be readily available with all information displayed so as to provide any person treating the patient on an emergency basis with full information as to the test results and diagnosis. Ironically, at Day's hospital the HIV test results were kept in a separate envelope attached to the chart.

II.
Any examination of the legal issues in this matter requires an understanding of AIDS and HIV.
AIDS is a viral disease that weakens or destroys the body's immune system. The disease is caused by the presence of the Human Immunodeficiency Virus ("HIV"), which attacks the body's T-lymphocyte cells that are a critical part of the body's immune system. As a result, the body is unable to withstand infections it would normally suppress. These resulting infections, known as "opportunistic diseases," eventually cause permanent disability and death. AIDS is defined by New Jersey health regulations as the presence of both the *630 HIV virus and one or more opportunistic diseases. Thus, a person may test positive for the HIV virus and yet not exhibit any signs of illness; that person is asymptomatic. Persons who exhibit effects of immunodeficiency, such as fever, weight loss, night sweats, or diarrhea, but do not have any opportunistic diseases are described as hving AIDS-related Complex ("ARC"). See N.J.A.C. 8:57-1.14(b). AIDS has no known cure. [Doe v. Barrington, 729 F. Supp. 376, 380 (D.N.J. 1990); footnotes omitted; see also Board of Ed. of Plainfield v. Cooperman, 209 N.J. Super. 174, 195-200, 507 A.2d 253 (App.Div. 1986), mod & aff'd 105 N.J. 587, 589-590, 523 A.2d 655 (1987)].
A summary of the testimony of Selwyn and Day reveals the following facts about AIDS. AIDS is diagnosed by the presence of one of the indicator opportunistic infections, such as PCP or Kaposi's sarcoma. Thus, the diagnosis of AIDS is consistent with a positive HIV blood test and PCP. HIV infection is not AIDS and there is some dispute as to the length of the "incubation period" between HIV infection and the onset of AIDS. The experts here speculated that this period ranges from months to years.
While the issue of HIV transmission is still subject to some controversy and debate, three methods of transmission have been generally identified: (1) intimate sexual contact; (2) parenteral (e.g., injection or other invasive procedure breaking the skin) or mucous-membrane inoculation of blood; and (3) from a woman to her child during pregnancy, delivery, or shortly after birth (through infected breast milk). Casual contact between persons has not been established as a means of transmission. While HIV is described as less contagious than other viruses, Selwyn and Day generally agree that one suffering from AIDS is more contagious than one simply HIV infected. At the relevant times in this action there were no reported cases of transmission of HIV infection from a health care worker to a patient.[9] Notwithstanding the absence of a reported *631 case at the time of trial, neither side argued that such transmission was not possible. Both sides agreed that the risk of transmission could be quantified. The nature, extent and significance of such risk is a critical and contested issue in this case.
HIV was isolated in 1983. Thereafter, scientists developed tests that detect the presence of HIV antibodies in blood. The mean latency period between initial infection by the virus and the onset of AIDS is, according to current figures, in excess of five years. This may be an underestimate of the actual mean latency period, because at the time of trial, the AIDS epidemic had only been under observation for approximately eight years.
AIDS proves fatal in virtually every reported case. Although no cure for AIDS presently exists, doctors have made progress in treating the opportunistic infections associated with AIDS. In addition, certain treatments have shown promise in slowing the progression from HIV infection to AIDS to death. People with AIDS often have extended periods during which they have only minor symptoms, if any, and are able to lead full, productive lives.
AIDS presents a significant medical and social crisis for New Jersey and the United States as a whole. At the time of trial, over 3,000 residents of New Jersey were diagnosed with AIDS; an estimated 100,000 New Jersey citizens  one out of every 75 residents  were infected with HIV. Bushburg & Convisor, Clinical Guidelines for the Diagnosis & Treatment of AIDS (N.J.Dept. of Health 1988) at 8.

III.
Plaintiff asserts that the medical center, Doody and Lee breached a duty of confidentiality in failing to restrict access to *632 plaintiff's medical records, thus causing widespread and improper dissemination of information about plaintiff's medical condition. Plaintiff argues that as a result of this breach of confidentiality, his ability to practice was impaired so significantly that his medical practice was damaged, if not destroyed. Plaintiff's confidentiality-based claims arise out of his status as a patient. While plaintiff was unable to identify specifically the actual sources of the disclosure of his diagnosis, he argues that the medical center's failure to implement meaningful restrictions on access to his medical records is sufficient to establish liability. In sum, he urges that the failure of the medical center to take reasonable precautions regarding access to his records establishes liability. Defendants argue that any disclosure by its employees or others outside of its control is beyond its responsibility and cannot be the basis of liability.
The physician-patient privilege has a strong tradition in New Jersey. The privilege imposes an obligation on the physician to maintain the confidentiality of a patient's communications. Stempler v. Speidell, 100 N.J. 368, 495 A.2d 857 (1985). This obligation of confidentiality applies to patient records and information and applies not only to physicians but to hospitals as well. Unick v. Kessler Memorial Hosp., 107 N.J. Super. 121, 257 A.2d 134 (Law Div. 1969). This duty of confidentiality has been the subject of legislative codification which reflects the public policy of this State. N.J.S.A. 2A:84A-22.1 et seq. The patient must be able "to secure medical services without fear of betrayal and unwarranted embarrassing and detrimental disclosure...." Piller v. Kovarsky, 194 N.J. Super. 392, 396, 476 A.2d 1279 (Law Div. 1984). The privacy right on which the privilege is based has been held to a level warranting constitutional protection. See United States v. Westinghouse, 638 F.2d 570, 577 (3 Cir.1980); Doe v. Barrington, supra, 729 F. Supp. at 382.
Notwithstanding the strong policy in favor of the physician-patient privilege and the ensuing obligation of confidentiality, *633 exceptions to the privilege have been widely recognized. In Hague v. Williams, 37 N.J. 328, 181 A.2d 345 (1962), which predates N.J.S.A. 2A:84A-22.1 et seq., plaintiff claimed damages as a result of the disclosure of a child's condition to an insurance carrier. The Supreme Court noted both a "public interest" and a "private interest of the patient" exception to the privilege. In McIntosh v. Milano, 168 N.J. Super. 466, 403 A.2d 500 (Law Div. 1979) Judge Petrella discussed the concept of the "duty to warn" third parties as an exception to the general rule of confidentiality. McIntosh noted that the Principles of Medical Ethics recognizes the non-absolute nature of the obligation of confidentiality.
A physician may not reveal the confidences entrusted to him in the course of medical attendance, or the deficiencies he may observe in the character of patients, unless he is required to do so by law or unless it becomes necessary in order to protect the welfare of the individual or of the community. [American Medical Association, Principles of Medical Ethics (1957) § 9; McIntosh v. Milano, supra, 168 N.J. Super. at 491, 403 A.2d 500]
See also Tarasoff v. Regents of Univ. of California, 17 Cal.3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976).[10]
An additional exception to the concept of confidentiality is a physician's or hospital's statutory obligation to report contagious diseases to health authorities. N.J.S.A. 26:4-15 requires that "[e]very physician shall, within 12 hours after his diagnosis that a person is ill or infected with a communicable disease ... report such diagnosis and such related information as may be *634 required by the State Department of Health." N.J.S.A. 26:4-19 similarly requires that the supervisor of a public or private institution report to the local health board any diagnosis of a contagious disease made within the institution. N.J.A.C. 8:57-1.3 sets forth a list of communicable diseases reportable by physicians. The list was amended in 1983, effective March 7, 1982, to require that patients diagnosed with PCP  plaintiff's diagnosed condition  be reported to the New Jersey Department of Health.
Certainly, a most apparent exception to the general rule of confidentiality is the implied right to make available to others involved in the patient's care information necessary to that care. Plaintiff does not argue that the legitimate disclosure of his medical information under this patient care exception is a basis of his cause of action. Both N.J.S.A. 2A:84A-22.2 and the recently enacted provisions of N.J.S.A. 26:5C-8 (which postdate the events in this matter) allow for the dissemination of a patient's records and information
... [t]o qualified personnel involved in the medical education or in the diagnosis and treatment of the person who is the subject of the record. Disclosure is limited to only personnel directly involved in medical education or in the diagnosis and treatment of the person.
It is against this basic policy and statutory framework that the conduct of a hospital dealing with an AIDS patient must be measured.[11]
The present day public perception of AIDS was an important consideration in the adoption and implementation of procedures established by the department of health and the *635 medical center. The impact of the public perception has been widely recognized.
Individuals infected with HIV, whether HCP [health care professional] or patient, are concerned with maintaining the confidentiality of their health status. HIV infection is associated with sexual practice and drug use, universally regarded as personal and sensitive activities. In addition, the majority of people infected with HIV in the United States are members of groups that are traditionally disfavored. Even before the AIDS epidemic, gays and intravenous (IV) drug users were subject to persistent prejudice and discrimination. AIDS brings with it a special stigma. Attitude surveys show that even though most Americans understand the modes through which HIV is spread, a significant minority still would exclude those who are HIV-positive from schools, public accommodations, and the workplace. Unauthorized disclosure of a person's serologic status can lead to social opprobrium among family and friends, as well as loss of employment, housing and insurance. [Gostin, op. cit. supra at 46; footnotes omitted]
Intimately involved with the issue of confidentiality are the issues of pre-test counselling and informed consent of the patient to allow the hospital to test. In May 1986, Ilana B. Pachter, M.D. of the medical center department of laboratories advised the medical and dental staff as follows:
Because of the far-reaching social and personal consequences of both the request for this test and the results of this test, it is recommended that patients never be tested without their knowledge and that appropriate written informed consent be obtained prior to performance of the HTLV-III ELISA test. The test should not be ordered using the blanket consent on hospital admission.
To fully implement an intelligent informed consent[12], the department of health with both Selwyn and Day concurring, agreed that there must be pre-test counselling of a patient prior to the administration of the HIV-test. This need has been widely recognized by the health care institutions, as well.
Hospitals that perform HIV tests for any purpose must recognize the extreme sensitivities associated with these tests by adopting policies that address the use of informed consent, the standards for using an HIV test as a screening device, notification of patients, the need for counseling, the appropriate use of test results to influence treatment decisions, and the maintenance of confidentiality of information about HIV status....

*636 Hospitals routinely seek a general consent to treatment when a patient is admitted. Specific consents for individual laboratory tests for diagnostic procedures are rarely sought.... But because a positive HIV test can have profound implications for an individual's health and lifestyle, it is widely accepted that patients should receive information about the implications of HIV testing before and after the test is performed. Patients who have been advised of the implications of testing beforehand may be better prepared to cope with the ramifications of a positive result....
The Committee recommends that when an HIV test is performed for any reason other than blind epidemiologic studies on HIV prevalence, the informed consent of the patient should be obtained. The physician is the most appropriate person to seek consent because he or she can fully explain the nature of the test and its implications. In obtaining the consent, the individual requesting the test should explain the reasons for conducting the test, describe the way in which the test results may affect the patient's care, review the personal significance for the patient of the possible results of the test, and arrange for appropriate counseling as determined necessary by the physician. [American Hospital Association, AIDS/HIV Infection Policy: Ensuring a Safe Hospital Environment, (November 1987) iv-v; see also New Jersey Hospital Association, Guidelines for Meeting the Challenges of AIDS (1988) adopting a similar policy]
In March, 1986, the New Jersey Department of Health circulated a memorandum to physicians and hospitals stressing the need for patient counselling in the administration and interpretation of HIV testing. In June 1987, when plaintiff was admitted to the medical center, counselling was a critical procedure.
While the immediate obligation of person-to-person counselling rests with the physician in charge of the case, the health care facility is still intimately involved in the counselling process. The record is devoid of any evidence that pre-test counselling was administered to plaintiff either by the treating physician or by hospital personnel. More significantly, however, the form issued under the name of and utilized by the medical center for fulfilling the informed consent requirement is troublesome on its face. The form prepared by the medical center contained the following language:
I William Behringer hereby give my consent to the Medical Center at Princeton to have my blood tested for antibodies to HTLV III Virus as ordered by my physician. The results of the test will be reported only to the ordering physician. [Emphasis supplied]
The form mentions a report only to the ordering physician. The procedures utilized by the medical center not only included *637 a report to the attending physician; but, more significantly, allowed for placement of the test results on the chart without limitation on the availability and access of the chart to the entire medical center community. While the regulations of the medical center appear to impose limits on access, Doody's testimony revealed that access to the chart by medical center personnel was virtually without restriction. Whatever assurance the patient received from the consent form as to the confidentiality of the test was dispelled by the charting of the results and the failure of the medical center to inform the patient of the potential for public exposure through the chart of the test records.
The issue of charting was the subject of intense debate between Selwyn and Day. Selwyn urged that the chart, or at least the test results, be available on a "need to know" basis with HIV test results being sequestered in a different location. Day, on the other hand, called for open access to the chart and test results because of the HCW's need to have full knowledge of the patient's condition in case of emergency or otherwise. When considering the issue in terms of a physician as a patient in his own hospital, the need for careful treatment of diagnostic or other medical information becomes more acute. Professor Gostin commented specifically in reference to HIV-positive physicians:
... physicians have strong grounds for desiring personal privacy and confidentiality of medical information. Their cooperation with the hospital in protecting against the spread of infections relies upon their trust that their serological status will be kept confidential. [Gostin, "HIV-Infected Physicians and the Practice of Seriously Invasive Procedures," Hastings Center Rep. (Jan.-Feb. 1989) at 32, 36.]
The significance of the concern expressed by Gostin was not lost on the infectious disease specialist or Lee. Notwithstanding that the results of plaintiff's HIV test were known on June 17, the results were not charted until late in the day of June 18, 1987 at about the time or just after plaintiff's discharge. Both physicians understood that charting of the results would lead to widespread disclosure of results. The decision as to timing was *638 made with a clear knowledge that the results of the charting were entirely forseeable. Unfortunately, the prophesy of the knowledge of the test results was fulfilled, and once the results were charted, the die was cast. According to Lee, both he and the infectious disease specialist made an additional determination  not to notify Doody of the test results. All parties could and did predict a foreseeable result that was obvious.
The medical center's disregard for the importance of preserving the confidentiality of plaintiff's patient medical records was evident even before the charting of the HIV test results. A review of plaintiff's hospital chart reveals not only the HIV test results, but the results of the bronchoscopy  PCP  which all concede was a definitive diagnosis of AIDS. While the medical center argues that the decision regarding charting is one for the physicians to make, the medical center cannot avoid liability on that basis. It is not the charting per se that generates the issue; it is the easy accessibility to the charts and the lack of any meaningful medical center policy or procedure to limit access that causes the breach to occur. Where the impact of such accessibility is so clearly foreseeable, it is incumbent on the medical center, as the custodian of the charts, to take such reasonable measures as are necessary to insure that confidentiality. Failure to take such steps is negligence. See Martin v. Bengue, Inc., 25 N.J. 359, 136 A.2d 626 (1957); Menth v. Breeze Corp. Inc., 4 N.J. 428, 73 A.2d 183 (1950); Avedisian v. Admiral Realty Corp., 63 N.J. Super. 129, 164 A.2d 188 (App.Div. 1960); Andreoli v. Natural Gas Co., 57 N.J. Super. 356, 154 A.2d 726 (App.Div. 1959); Glaser v. Hackensack Water Co., 49 N.J. Super. 591, 141 A.2d 117 (App.Div. 1958); Lutz v. Westwood Transp. Co. 31 N.J. Super. 285, 106 A.2d 329 (App.Div. 1954), certif den. 16 N.J. 205, 108 A.2d 120 (1954). The argument that such information may have been transmitted by employees acting beyond the scope of their employment is not persuasive. The requirement of confidentiality is to protect the patient. This was not a patient hospitalized for a trivial or common-place malady. Insuring confidentiality *639 becomes a matter of prime concern. The failure to recognize the potential for employee breach of confidentiality provides no defense. See National Premium Budget Plan Corp. v. National Fire Ins. Co., 97 N.J. Super. 149, 234 A.2d 683 (Law Div. 1967), aff'd 106 N.J. Super. 238, 254 A.2d 819 (App.Div. 1969), certif. den. 54 N.J. 515, 257 A.2d 113 (1969); and see Restatement, Torts § 449 (1965), which states:
If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby. [at 223, 234 A.2d 683]
Insuring confidentiality even by medical center employees required more, in the present case, than simply instructing employees that medical records are confidential. The charts are kept under the control of the medical center with full knowledge of the accessibility of such charts to virtually all medical center personnel whether authorized or not. Little, if any, action was taken to establish any policy or procedure for dealing with a chart such as plaintiff's.
In Doe v. Barrington, supra, Judge Brotman discussed the privacy basis for confidentiality of an AIDS diagnosis.
The sensitive nature of medical information about AIDS makes a compelling argument for keeping this information confidential. Society's moral judgments about the high-risk activities associated with the disease, including sexual relations and drug use, make the information of the most personal kind. Also, the privacy interest in one's exposure to the AIDS virus is even greater than one's privacy interest in ordinary medical records because of the stigma that attaches with the disease. The potential for harm in the event of a nonconsensual disclosure is substantial....[12] [729 F. Supp. at 384]
[12] The "potential for harm" is demonstrated not only by the impact on plaintiff, but by numerous similar circumstances caused by a hysterical public reaction to AIDS. Judge Brotman cited a few examples: removal of a teacher with AIDS from teaching duties; refusal to rent an apartment to male homosexuals for fear of AIDS; firebombing of the home of hemophiliac children who tested positive for AIDS; refusal by doctors and health care workers to treat people with or suspected of having AIDS; refusal of co-workers of an AIDS victim to use a truck used by the victim; filing of a charge of attempted murder against an AIDS victim who spat at police; requiring an AIDS victim to wear a mask in a courtroom; denial to children with AIDS of access to schools; threatening to evict a physician who treated homosexuals; boycotting of *640 a public school after a child with AIDS was allowed to attend; firing of homosexuals who displayed cold symptoms or rashes; refusal of paramedics to treat a heart attack victim for fear he had AIDS; refusal by police to drive an AIDS victim to the hospital; police demands for rubber masks and gloves when dealing with gays; refusal to hire Haitians; and urging of funeral directors not to embalm the bodies of AIDS victims. Doe v. Barrington, supra, 729 F. Supp. at 384, n. 8; citations omitted.
Because the stakes are so high in the case of a physician being treated at his own hospital, it is imperative that the hospital take reasonable steps to insure the confidentiality of not only an HIV test result, but a diagnosis which is conclusive of AIDS, such as PCP. These precautions may include a securing of the chart, with access only to those HCWs demonstrating to designated record-keepers a bona-fide need to know, or utilizing sequestration procedures for those portions of the record containing such information. While a designation in a chart of sequestered information such as a diagnosis or test result may lead to speculation or rumor among persons not having access to the chart, this speculation is an acceptable cost to prevent free access to a chart where real information improperly disseminated will cause untold harm. This court recognizes that in some circumstances, such as rounds at a teaching hospital, exposure to a patient's records must be greater than to solely physicians or students directly involved in the patient's care. It is incumbent upon the hospital to impress upon these physicians or students the significance of maintaining the confidentiality of patient records.
The issue of the confidentiality of hospital records of AIDS-positive physicians was addressed in X v. Y, 2 All E.R. 649 (Q.B. 1987). In X v. Y., plaintiff, a British health authority, sought an injunction against defendant, a newspaper reporter, from publishing information about two physicians who were AIDS-positive and continuing in practice. In balancing the interests of a free press with the rights of a patient, the court held that the public interest in preserving the confidentiality of *641 these hospital records outweighed the public interest in a free press.
On the one hand, there are the public interests in having a free press and an informed public debate; on the other, it is in the public interest that actual or potential AIDS sufferers should be able to resort to hospitals without fear of this being revealed, that those owing duties of confidence in their employment should be loyal and should not disclose confidential matters and that, prima facie, no one should be allowed to use information extracted in breach of confidence from hospital records even if disclosure of the particular information may not give rise to immediately apparent harm. [Id. at 660]
The court went on to note:
I keep in the forefront of my mind the very important public interest in freedom of the press. And I accept that there is some public interest in knowing that which the defendants seek to publish (in whichever version). But in my judgment those public interests are substantially outweighed when measured against the public interests in relation to loyalty and confidentiality both generally and with particular reference to AIDS patients' hospital records.... The records of hospital patients, particularly those suffering from this appalling condition should, in my judgment, be as confidential as the courts can properly keep them in order that the plaintiffs may be free from suspicion that they are harbouring disloyal employees'.... [Id. at 661]
The present case involves no competing interest, such as a free press. The confidentiality breached in the present case is simply grist for a gossip mill with little concern for the impact of disclosure on the patient. While one can legitimately question the good judgment of a practicing physician choosing to undergo HIV testing or a bronchoscopy procedure at the same hospital where he practices, this apparent error in judgment does not relieve the medical center of its underlying obligation  to protect its patients against the dissemination of confidential information. It makes little difference to identify those who "spread the news." The information was too easily available, too titillating to disregard. All that was required was a glance at a chart, and the written words became whispers and the whispers became roars. And common sense told all that this would happen.
This court holds that the failure of the medical center and Lee as director of the department of laboratories, who were together responsible for developing the misstated informed consent form, the counselling procedure and implementation of *642 the charting protocol, to take reasonable steps to maintain the confidentiality of plaintiff's medical records, while plaintiff was a patient, was a breach of the medical center's duty and obligation to keep such records confidential. The medical center is liable for damages caused by this breach.

IV.
Plaintiff, as a physician, asserts a cause of action under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-4.1,[13] based on the restriction and ultimate curtailment of plaintiff's surgical privileges at the medical center.[14]
New Jersey prohibits unlawful discrimination, or any unlawful employment practice, against a person in a place of public accommodation on the basis that that person is handicapped. N.J.S.A. 10:5-4.1. A review of the definitional sections of the LAD bring both the medical center and plaintiff within its scope. A hospital such as the medical center falls *643 within the definition of a place of public accommodation. N.J.S.A. 10:5-5(l). Plaintiff has abandoned his argument that he was an "employee" of the medical center. Plaintiff relies on N.J.S.A. 10:5-12(l), which provides that it shall be unlawful discrimination:
For any person to refuse to buy from, sell to, lease from or to, license, contract with or trade with, provide goods, services or information to, or otherwise do business with any other person on the basis of the race, creed, color, national origin, ancestry, age, sex, marital status, liability for service in the Armed Forces of the United States, or nationality of such other person.... [Emphasis supplied]
The medical center argues that the relationship of a surgeon to a hospital or an operating room is not one which falls under the privilege of the LAD.
In determining the applicability of the LAD to plaintiff, certain basic policy considerations must be stated. New Jersey has historically been "in the vanguard in the fight to eradicate the cancer of unlawful discrimination of all types from our society." Peper v. Princeton University, 77 N.J. 55, 80, 389 A.2d 465 (1978). The LAD is to be liberally interpreted with due regard for "its remedial nature" and "humanitarian concerns." Panettieri v. C.V. Hill Refrig., 159 N.J. Super. 472, 483, 388 A.2d 630 (App.Div. 1978).
The medical center asserts that not only is there no employer-employee relationship between the surgeon and the hospital, but there is insufficient evidence of "control" over the surgeon to warrant the application of the broad provisions of N.J.S.A. 10:5-12. The proofs presented indicate otherwise. The surgeon must be approved and accepted by the medical and dental staff and ultimately the board of trustees. In addition, the surgeon is subject to the by-laws of the medical center and its regulatory authority over those who practice there. The surgeon is subject to peer review and other methods of control over his or her practice. While there is not the relationship of employer-employee, the providing of a fully-equipped, fully-staffed, regulated and controlled operating room to a surgeon whose practice in the medical facility has been passed on and *644 approved by the medical facility is sufficient to bring that surgeon within the scope of N.J.S.A. 10:5-12. See Desai v. St. Barnabas Medical Center, 103 N.J. 79, 510 A.2d 662 (1986); Berman v. Valley Hosp., 103 N.J. 100, 510 A.2d 673 (1986); Belmar v. Cipolla, 96 N.J. 199, 475 A.2d 533 (1984).
The statute only applies, however, if plaintiff is determined to be handicapped. N.J.S.A. 10:5-4.1. In Poff v. Caro, 228 N.J. Super. 370, 549 A.2d 900 (Law Div. 1987), the Law Division determined, in the context of a refusal to rent to homosexuals, that "a person suffering from AIDS clearly has a severe handicap within the meaning of the Law Against Discrimination." Id. at 376, 549 A.2d 900.
Courts in other jurisdictions have universally held that AIDS is a handicap within the meaning of laws prohibiting handicap discrimination. Both federal trial and courts of appeal have held AIDS to be a handicap protected under the Rehabilitation Act of 1973, 29 U.S.C.A. § 794, which prohibits discrimination against the handicapped by recipients of federal funds. See, e.g., Chalk v. United States District Court, 840 F.2d 701 (9 Cir.1988); Doe v. Dolton Elementary School Dist. No. 148, 694 F. Supp. 440 (N.D.Ill. 1988); Ray v. School Dist. of DeSoto County, 666 F. Supp. 1524 (M.D.Fla. 1987). Likewise, various state courts have held AIDS to be a qualified handicap under their respective discrimination laws. See, e.g., Cronan v. New England Tel. Co., 41 FEP Cases 1273 (Mass.Super.Ct. 1986). Cf. School Bd. of Nassau Cty, Fla. v. Arline, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987).
Plaintiff, as a surgeon suffering from AIDS, was protected by the LAD.[15]
*645 Plaintiff's claim requires an examination of the restrictions placed on the exercise of his surgical privileges from June 1987, until his death on July 2, 1989. The restrictions took different forms during that period:
a) initially Doody cancelled all of plaintiff's surgery, pending review by the president of the medical and dental staff and chairman of the department of surgery;
b) thereafter, plaintiff's patients were required to sign an informed consent form, noting that plaintiff was HIV positive; and
c) finally, the medical center adopted a "policy" agreed to by the medical and dental staff and the trustees, limiting "any activity" including surgical procedures "that creates a risk of transmission of the disease to others." The adoption of this policy did not eliminate the use of the informed consent form.
The Supreme Court has set forth several standards which must be considered by a court reviewing hospital actions and policies. In Desai v. St. Barnabas Medical Center, supra, the Supreme Court noted that if a hospital policy decision reasonably serves an "evident public health purpose," it will be sustained notwithstanding that the ultimate effect of the policy may be discriminatory. 103 N.J. at 91, 510 A.2d 662. Notwithstanding the narrow standard of review articulated in Desai, the Supreme Court in Nanavati v. Burdette Tomlin Mem. Hosp., 107 N.J. 240, 526 A.2d 697 (1987), emphasized the importance of scrutinizing such policy when its effect is the revocation of staff privileges.
The test for judicial review of such a decision is whether it is supported by `sufficient reliable evidence, even though of a hearsay nature, to justify the result'....
Underlying the more relaxed standard is our growing awareness that courts should allow hospitals, as long as they proceed fairly, to run their own business. *646 That sense is tempered by the recognition that doctors need staff privileges to serve their patients, and that the public interest requires that hospitals treat doctors fairly in making decisions about those privileges. Notwithstanding our more indulgent review of hospital decisions, a decision denying or revoking staff privileges merits a closer look than a decision setting the standard for the determination of those privileges. [Id. at 249-250, 526 A.2d 697, citations omitted]
While neither Nanavati nor Desai dealt with rights established by the LAD, certainly the cautions expressed in Nanavati become paramount considerations in balancing the critical rights of the hospital and the equally important rights of a doctor alleging discriminatory conduct. The medical center concedes that the action taken against plaintiff was a result of his AIDS diagnosis and the concern for the hospital and patients that the handicap generated.
In the present case, by conceding that the only reason for suspending or terminating privileges is the positive AIDS diagnosis, a handicap protected by the statute, the medical center cannot dispute that plaintiff has established a prima facie case of discrimination under the LAD. Clowes v. Terminex Int'l, Inc., 109 N.J. 575, 597, 538 A.2d 794 (1988); Andersen v. Exxon Corp., 89 N.J. 483, 492, 446 A.2d 486 (1982).
By way of defense, the medical center asserts that the circumstances of plaintiff's condition and the effect thereof is sufficient basis for restricting plaintiff's privileges. In determining whether a surgeon with AIDS may legitimately be restricted in his surgical privileges under the LAD, the test to be applied is whether the continuation of surgical privileges, which necessarily encompasses invasive procedures, poses a "reasonable probability of substantial harm" to others, including co-employees and, more importantly, patients. Jansen v. Food Circus Supermarkets, 110 N.J. 363, 374-375, 541 A.2d 682 (1988); N.J.A.C. 13:13-2.8. There must be a "materially enhanced risk of serious injury." Jansen v. Food Circus Supermarkets, supra, 110 N.J. at 376, 541 A.2d 682. And, critical to this case, there must be a distinction between the risk *647 of an incident taking place and the risk of injury from such incident. In the present case both parties agree that the risk of incident, i.e., transmission of the HIV virus from physician to patient, is small, but that the risk of injury from such transmission is high, i.e., death.
In asserting a defense based on safety of patients and hospital personnel, the medical center assumes the burden of "establish[ing] with a reasonable degree of certainty that it reasonably arrived at the opinion that the employee's handicap presented a materially enhanced risk of substantial harm in the workplace." Id. at 383, 541 A.2d 682.
At the time of plaintiff's diagnosis, little was known about the potential transmission of HIV from surgeon to patient. While no "reported cases" were known to the experts  Selwyn or Day  neither disputed that there was such a risk. Selwyn interpreted the risk to be virtually non-existent statistically; Day urged that the risk was real and greater than that revealed by the then-existing statistics. Both experts agreed that once HIV is transmitted and the patient contracted AIDS, the prognosis is death.
The medical center made painstaking inquiries to determine a proper result. The medical and dental staff, board of trustees, biomedical ethics committee, joint committees and various other groups all convened to discuss and debate the appropriate action to be taken. A review of the minutes of the various committees meeting on the subject reveals point and counterpoint as to all critical issues. Harsh debate ensued between the medical and dental staff and the medical center administration. Studies were produced from the CDC, epidemiologists and medical ethicists. The issue was fully aired.[16]
*648 The ultimate resolution reached by the medical center restricting invasive procedures where there is "any risk to the patient," coupled with informed consent, implicates serious policy considerations which must be explored. It is axiomatic that physicians performing invasive procedures should not knowingly place a patient at risk because of the physician's physical condition. Gostin, op. cit., supra at 34. The policy adopted by the medical center barring "any procedures that pose any risk of virus transmission to the patient" appears to preclude, on its face, the necessity of an informed consent form; if there is "any risk," the procedure cannot be performed. The problem created by the "any risk" standard is best evidenced by the facts of this case. When Doody made his initial decision to cancel plaintiff's scheduled surgical procedures, he did so over the objection of both the president of the medical and dental staff as well as the chairman of the department of surgery. In fact, the chairman went so far as to write:
... I have done some reading, research into this the past several months. From all I can find a doctor, surgeon, with AIDS cannot give this to his patient as long as usual precautions are taken ... while operating. I believe he should be allowed to carry on as long as his general health status allows. I will admit him in surgery when possible if he desires.
Reasonable persons professing knowledge of the subject matter may differ as to whether there is "any" risk involved in an invasive surgical procedure by a surgeon carrying a disease *649 that will lead to his death and, if transmitted during the surgical procedure, to the death of the patient. This court is well aware of the admonition expressed in Desai, as well as the concern expressed by Chief Justice Hughes in In re Quinlan, 70 N.J. 10, 355 A.2d 647 (1976), when he stated for the Court:
Doctors * * * to treat a patient, must deal with medical tradition and past case histories. They must be guided by what they do know. The extent of their training, their experience, consultation with other physicians, must guide their decision-making processes in providing care to their patient. The nature, extent and duration of care by societal standards is the responsibility of a physician. The morality and conscience of our society places this responsibility in the hands of the physician. What justification is there to remove it from the control of the medical profession and place it in the hands of the courts?
Such notions as to the distribution of responsibility, heretofore generally entertained, should however neither impede this Court in deciding matters clearly justiciable nor preclude a re-examination by the Court as to underlying human values and rights. Determinations as to these must, in the ultimate, be responsive not only to the concepts of medicine but also to the common moral judgment of the community at large. In the latter respect the Court has a nondelegable judicial responsibility. [Id. at 44, 355 A.2d 647; citations omitted]
This court, too, must be concerned that the medical center decision-makers, while no doubt acting in good faith in the decision-making process, are acting with the knowledge that their decisions may well affect their ultimate ability to practice their chosen profession.
Nevertheless, there must be a way to free physicians, in the pursuit of their healing vocation, from possible contamination by self-interest or self-protection concerns which would inhibit their independent medical judgments for the well-being of their ... patients. [Id. at 49, 355 A.2d 647.]
There are principles of law that guard against the concern for self-interest, by including in the decision-making process the most critical participant  the patient. The doctrine of informed consent, as an adjunct to the adopted medical center "any risk" policy, provides the necessary element of patient control which is lacking from the policy standing alone.
Before a physician may perform a surgical or invasive procedure upon a patient, he must obtain the patient's informed consent.

*650 [Informed consent] is essentially a negligence concept, predicated on the duty of a physician to disclose to a patient such information as will enable the patient to make an evaluation of the nature of the treatment and of any attendant substantial risks, as well as of available options in the form of alternative therapies. See In re Conroy, 98 N.J. 321, 346 [486 A.2d 1209] (1985); Perna v. Pirozzi, supra, 92 N.J. [446] at 459 [457 A.2d 431] (1983); Canterbury v. Spence, supra, 464 F.2d [772] at 780 [(C.A.D.C. 1972)]; Kaplan v. Haines, supra, 96 N.J. Super. [242] at 255-258 [232 A.2d 840] [(1967)]. [Largey v. Rothman, supra, 110 N.J. 204 at 208, 540 A.2d 504 (1988)]
The physician exposing the patient to a course of treatment has a duty to explain, in terms understandable to the patient, what the physician proposes to do. The purpose of this legal requirement is to protect each person's right to self-determination in matters of medical treatment. See In re Farrell, 108 N.J. 335, 347, 529 A.2d 404 (1987). The physician's duty is to explain, in words the patient can understand, that medical information and those risks which are material. Medical information or a risk of a medical procedure is material when a reasonable patient would be likely to attach significance to it in deciding whether or not to submit to the treatment.
Taking into account what the physician knows or should know to be the patient's informational needs, the physician must make reasonable disclosure of the information and those risks which a reasonably prudent patient would consider material or significant in making the decision about what course of treatment, if any, to accept. Such information would generally include a description of the patient's physical condition, the purposes and advantages of the proposed surgery, the material risks of the proposed surgery, and the material risks if such surgery is not provided. In addition, the physician should discuss all available options or alternatives and their advantages and risks. Largey v. Rothman, supra, 110 N.J. at 211, 540 A.2d 504.
Plaintiff argues: 1) the risk of transmission of HIV from surgeon to patient is too remote to require informed *651 consent, and 2) the law of informed consent does not require disclosure of the condition of the surgeon.[17]
Both parties focus on the risk of transmission and results therefrom in applying the two standards raised in plaintiff's claim under the LAD. The Jansen standard states that the risk must be one which will create a "reasonable probability of substantial harm," and the Largey standard requires disclosure of a "material risk" or one to which a reasonable patient would likely attach significance in determining whether to proceed with the proposed procedure. It is the court's view that the risk of transmission is not the sole risk involved. The risk of a surgical accident, i.e., a needlestick or scalpel cut, during surgery performed by an HIV-positive surgeon, may subject a previously uninfected patient to months or even years of continual HIV testing. Both of these risks are sufficient to meet the Jansen standard of "probability of harm" and the Largey standard requiring disclosure.
Both Selwyn and Day agreed that the statistical risk of transmission from health-care worker to patient is small  less than one-half of one percent. At the time of trial, there were no reported cases of transmission. See n. 9, supra at 630, 592 A.2d at 1267. But the statistical analysis is flawed. Gostin noted the following:
There has been no scrutiny of transmission of HIV from physicians to patients, and there is no recorded case where it has occurred. This is not surprising since there has been no systematic attempt to discover which physicians are HIV positive.[18] But there has been careful examination of transmission from patient to health care worker, and some indication of the level of risk in both *652 directions can be ascertained. The possibility of transmission in health care settings has been demonstrated by approximately sixteen cases where health care workers seroconverted from occupational exposure to HIV....
Physicians performing seriously invasive procedures, such as surgeons, have a potential to cut or puncture their skin with sharp surgical instruments, needles, or bone fragments. Studies indicate that a surgeon will cut a glove in approximately one out of every four cases, and probably sustain a significant skin cut in one out of every forty cases. Given these data, it has been calculated that the risk of contracting HIV in a single surgical operation on an HIV-infected patient is remote  in the range of 1/130,000 to 1/4,500. [footnotes omitted]
It is impossible accurately to calculate the level of risk of HIV transmission from surgeon to patient. Surgeons who cut or puncture themselves do not necessarily expose the patient to their blood, and even if they do the volume is extremely small. A small inoculum of contaminated blood is unlikely to transmit the virus. This suggests that the risk of infection from surgeon to patient is much lower than in the opposite direction. Nonetheless, the fact that the surgeon is in significant contact with the patient's blood and organs, together with the high rate of torn gloves, makes it reasonable to assume that the risk runs in both directions, as is the case with the hepatitis B virus. The cumulative risk to surgical patients, arguably, is higher. While an HIV-infected patient is likely to have relatively few seriously invasive procedures, the infected surgeon, even if the virus drastically shortens his surgical career, can be expected to perform numerous operations. Assuming that the surgical patient's risk is exceedingly low (1/130,000), the risk that one of his patients will contract HIV becomes more realistic the more operations he performs  1/1,300 (assuming 100 operations) or 1/126 (assuming 500 operations). Patients, of course, cannot expect a wholly risk-free environment in a hospital. But there does come a point where the risk of a detrimental outcome becomes sufficiently real that it is prudent for the profession to establish guidelines. [Gostin, op. cit., supra at 33]
While the debate will rage long into the future as to the quantifiable risk of HIV transmission from doctor to patient, there is little disagreement that a risk of transmission, however small, does exist. This risk may be reduced by the use of universal precautions, such as double gloving and the use of goggles and other similar devices.
In quantifying the risk, one must consider not only statistical data, but the nature of the procedure being performed. Plaintiff was a surgeon who specialized in surgery performed in the ear and mouth cavities. As Day indicated, much of plaintiff's surgery involved contact with the mucous membrane  an area particularly susceptible to transmission of HIV should the *653 surgeon incur a surgical accident involving the potential for exchange of blood.
In addition, the quantifiable risk of transmission is not dispositive of either the "materiality" or "risk of harm" issue. As Day testified, the risk of a surgical accident, such as a scalpel cut or needle stick, where there is exposure to the HIV-positive surgeon's blood will cause a patient to be exposed to the testing required by CDC recommendation no. 5, supra, notes 7 and 8. This includes HIV testing over an extended period with the attendant anxiety of waiting for test results, and the possible alterations to life style and child-bearing during the testing period, even if those results ultimately are negative. The risk of surgical accidents was quantified by Day and Selwyn as exceeding five percent, although, as set forth above, Gostin estimates glove cuts at 25% and significant skin cuts at 2 1/2 percent. Gostin, op. cit., supra at 33. In assessing the "materiality of risk," this court concludes that the risk of accident and implications thereof would be a legitimate concern to the surgical patient, warranting disclosure of this risk in the informed-consent setting. It is inconsistent with the underlying policy considerations expressed in Largey to suggest that the patient should be informed after the fact of the need for HIV testing and surveillance.
In balancing quantifiable risk with the necessity of informed consent, one must recognize the strong commitment of the New Jersey courts to the concept of a fully informed patient. Niemiera v. Schneider, 114 N.J. 550, 555 A.2d 1112 (1989); Largey v. Rothman, supra. Plaintiff argues that the use of the informed consent form is tantamount to a de facto termination of surgical privileges. Plaintiff further urges that patient reaction is likely to be based more on public hysteria than on a studied assessment of the actual risk involved. The answer to these arguments is two-fold. First, it is the duty of the surgeon utilizing the informed consent procedure to explain to the patient the real risk involved. If the patient's fear is without basis, it is likewise the duty of the surgeon to allay that *654 fear. This court recognizes that the burden imposed on the surgeon may not be surmountable absent further education of both the public and the medical community about the realities of HIV and AIDS. Second, the difficulties created by the public reaction to AIDS cannot deprive the patient of making the ultimate decision where the ultimate risk is so significant. The last word has not been spoken on the issue of transmission of HIV and AIDS. Facts accepted at one point in time are no longer accurate as more is learned about this disease and its transmission. See n. 9 supra.
Plaintiff further argues that there is no requirement under the doctrine of informed consent that a surgeon's physical condition be revealed as a risk of the surgery itself. The informed consent cases are not so narrow as to support that argument. In Largey v. Rothman, supra, the court spoke of not only an evaluation of the nature of the treatment, but of "any attendant substantial risks."[19] 110 N.J. at 208, 540 A.2d 504. See also Kaplan v. Haines, supra, 96 N.J. Super. at 255-258, 232 A.2d 840. As noted earlier, the risks can foreseeably include a needlestick or scalpel cut and, even with universal precautions can result in an exchange of the surgeon's blood.
Plaintiff urges that these issues should be dealt with on a case-by-case basis, wherein the hospital or medical staff monitors an HIV-positive surgeon and makes a determination as to *655 the surgeon's ability to perform a particular invasive procedure. While this approach may be an appropriate starting point, it can not be dispositive of the issue. Plaintiff's position fails to account for "any risk" and, more important, fails to consider the patient's input into the decision-making process. The position plaintiff seeks to implement is replete with the "anachronistic paternalism" rejected in both Canterbury v. Spence, supra, and by the Supreme Court in Largey v. Rothman, supra.
Plaintiff's assertion that the risk of transmission is so low as to preclude the necessity of restriction on surgical practice or a requirement of informed consent prompts perhaps a different view of the issue. Dr. Gordon G. Keyes suggests:
Instead of anguishing over the precise probability of an HIV-positive provider spreading AIDS to a patient, a more sensible approach weighs the risk posed by HIV-positive provider against the value of having these same providers performing invasive health-care services. [Keyes, "Health Care Professionals with AIDS: The Risk of Transmission Balanced Against the Interests of Professionals and Institutions," 16 Journal of College and University Law 589, 603 (1990)]
In making this analysis, Keyes suggests utilizing the risk-benefit analysis found in Restatement, Torts 2d, § 293(a)-(c) (1965). Under Keyes' theory, there are three elements to be considered:
(a) The social value which the law attaches to the interest which is to be advanced or protected by the conduct....
(b) The extent of the chance that this interest will be advanced or protected by the particular course of conduct....
(c) The extent of the chance that such interest can be adequately advanced or protected by another and less dangerous course of conduct. [Keyes, op. cit., supra at 604, n. 114]
The author concludes as follows:
The following criteria determines the magnitude of the risk to the patient:
a. The social value which the law attaches to the interests which are imperiled. The law places a very high value on a patient's safety and well-being.
b. The extent of the chance that the actor's conduct will cause an invasion of any interest of the other.... It is not possible to precisely quantify the chance of spread of HIV to a patient. In general terms, the probability is small but real.
c. The extent of the harm once a patient becomes HIV positive, the likely outcome is death.

*656 Of course risk must be balanced against the utility of a health-care provider performing invasive procedures. The Restatement provides an analytical framework for this as well.
For negligence purposes, the utility of the conduct is related to:
(a) The social value which the law attaches to the interest which is to be advanced or protected by the conduct. Society and the law have a significant interest in promoting access to medical care.... While society must protect the availability of vital services, there is no need to protect the services of any one provider. Generally, there will be many noninfected providers to replace those who have been restricted from performing invasive procedures.
(b) The extent of the chance that this interest will be advanced or protected by the particular course of conduct. Society's interest in promoting acquisition of health care can only occur if providers see patients. Since only a small percentage of all providers will be excluded from performing only one aspect of health care, restrictions due to HIV positivity will only interfere with the provision of a very small fraction of the total health care services. All of these services can be adequately provided by non-infected practitioners. [Id. at 603-604, n. 114; citations omitted]
Summarizing Keyes' broader policy considerations, the restrictions on HIV-positive physicians from providing services, where there is a chance of transmittal from injury and transfer of blood spillage into a surgical site, would have a limited effect on practitioners; the HIV-positive physicians could still practice medicine although precluded from performing invasive procedures. Lastly, the ethical relationship of doctor to patient would require such a restriction on invasive procedures.
Health-care providers and institutions should consider ethical aspects of the doctor-patient relationship in examining the risk posed by health-care providers infected with HIV. The patient and doctor occupy unequal positions in the relationship. The doctor is trained to recognize, diagnose, and avoid contracting the patient's disease. The doctor stands in a position of trust  a fiduciary position  in relation to the patient. A small but palpable risk of transmitting a lethal disease to the patient gives the doctor an ethical responsibility to perform only procedures that pose no risk of transmission.
The patient, on the other hand, has no corresponding ethical duty to the doctor. The patient is neither trained nor expected to ascertain the provider's health status. While secretive patients may transmit their diseases to unwary doctors, doctors are responsible for both their own health and the health of their patients. [Id. at 605; footnotes omitted]
Professor Gostin has also recognized the availability of alternative medical services as a relevant consideration in the area of informed consent and the larger issue of performance of *657 invasive procedures by HIV-positive physicians. While not adopting Keyes' analysis of the issue, Gostin notes:
Courts, therefore, require the physician to provide all information that a reasonable patient would find relevant to make an informed decision on whether to undergo a medical procedure. Risks that are relevant or "material" depend upon their severity, the probability that they would occur, and the circumstances under which they would be endured. As the severity of a potential harm becomes greater the need to disclose improbable risks grows, though courts have yet to assign a threshold for the probability of a grave harm beyond which it must be disclosed.
A reasonably prudent patient would find information that his physician is infected with HIV material to his decision to consent to a seriously invasive procedure because the potential harm is severe and the risk, while low, is not negligible. Moreover, he can avoid the risk entirely without any adverse consequences for his health: By choosing another equally competent physician (where available) he can obtain all the therapeutic benefit without the risk of contracting HIV from his physician. The patient, then, can demonstrate not only that the information is material to his decision, but that he would have made a different decision had he been given the facts. [Gostin, op. cit., supra at 33-34; emphasis supplied]
The obligation of a surgeon performing invasive procedures, such as plaintiff, to reveal his AIDS condition, is one which requires a weighing of plaintiff's rights against the patient's rights. New Jersey's strong policy supporting patient rights, weighed against plaintiff's individual right to perform an invasive procedure as a part of the practice of his profession, requires the conclusion that the patient's rights must prevail. At a minimum, the physician must withdraw from performing any invasive procedure which would pose a risk to the patient. Where the ultimate harm is death, even the presence of a low risk of transmission justifies the adoption of a policy which precludes invasive procedures when there is "any" risk of transmission. In the present case, the debate raged as to whether there was "any" risk of transmission, and the informed-consent procedure was left in place. If there is to be an ultimate arbiter of whether the patient is to be treated invasively by an AIDS-positive surgeon, the arbiter will be the fully-informed patient. The ultimate risk to the patient is so absolute  so devastating  that it is untenable to argue against *658 informed consent combined with a restriction on procedures which present "any risk" to the patient.[20]
In assessing the medical center's obligation under the LAD, it is the court's view that the burden under Jansen has been met, and there was a "reasonable probability of substantial harm" if plaintiff continued to perform invasive procedures. Plaintiff is not entitled to recovery under this statute. The medical center acted properly in initially suspending plaintiff's surgical privileges, thereafter imposing a requirement of informed consent and ultimately barring him from performing surgery. These decisions were not made spontaneously or without thought. One need only review the minutes of meeting after meeting where the debate raged and the various competing interests  the medical and dental staff and board  expressed their views. The seeking of input from medical ethicists and attorneys knowledgeable in this area belies any suggestion of prejudgment or arbitrariness on the part of the medical center. The result, while harsh to plaintiff, represents a reasoned and informed response to the problem.

V.
Plaintiff also claims damages as a result of tortious interference with economic relations. These claims are based on the medical center's suspending and restricting plaintiff's surgical privileges. These claims are derivative. Having determined that the actions of the medical center and Doody were proper, *659 this cause of action must fail. To the extent that this cause of action is based on a breach of confidentiality, plaintiff has prevailed on that cause of action and will be entitled to damages therefore.

VI.
A judgment as to liability is granted in favor of plaintiff against defendant medical center and defendant Lee on counts 1, 2, 3 and 6 of the complaint. A judgment is entered in favor of defendant medical center and defendant Doody as to counts 4, 5, and 7, no cause for action.
NOTES
[1] Although plaintiff in this matter is the Estate of William H. Behringer, all references to plaintiff will be to William Behringer.
[2] This opinion deals with the issue of liability only. Damages will be dealt with after further briefing by the parties on issues raised by this opinion. The issue of damages will be dealt with by a separate opinion.
[3] The implementing provisions of the policy adopted by the medical and dental staff provide as follows:

A known HIV seropositive member of the Medical and Dental Staff may be permitted to continue to admit and care for his patients in the hospital, but shall immediately suspend the performance of all surgical procedures, including surgical assisting. In addition, he shall not perform any procedures that involve piercing the integument, including IV's and phlebotomy. The member of the Medical and Dental Staff may request a review of privileges by his Department Chairman. The staff member's Department Chairman may re-credential the member of the Medical and Dental Staff with regard to allowing procedures in accordance with the policy for HIV seropositive Health Care Workers approved by the Medical and Dental Staff and Board of Trustees.
[4] Hussain, "Risk to Surgeons: A Survey of Accidental Injuries During Operations," 75 Brit. J. of Surgery 314 (1988).
[5] But see Largey v. Rothman, 110 N.J. 204, 540 A.2d 504 (1988) discussed, infra at 651, 592 A.2d at 1279.
[6] Plaintiff objected to the admissibility and consideration of Day's opinion. The objection was premised on the conclusion that Day's views were outside of the "mainstream of accepted medical views." In addition, plaintiff argued that Day lacked the qualifications to offer opinions on the issue of AIDS transmission and other relevant matters because of her lack of training as an epidemiologist. See Rubanick v. Witco Chemical Corp., 225 N.J. Super. 485, 542 A.2d 975 (Law Div. 1988), rev'd 242 N.J. Super. 36, 576 A.2d 4 (App.Div. 1990), appeal pending ___ N.J. ___ (1991). While their conclusions differed about interpretation of terms such as "significant risk," both Selwyn and Day relied on the same statistical information. The conclusions of the parties were in dispute, but these conclusions were simply matters of interpretation of information. Both experts met the threshold requirement of establishing a factual and scientific basis for their opinions. Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981). While less weight was given to Day's opinion than that of Selwyn, information about operating-room procedures and similar matters was considered and given substantial weight.
[7] "Centers for Disease Control, Recommendations for Preventing Transmission of Infection with Human T-Lymphotropic Virus Type III/Lymphadenopathy-Associated Virus during Invasive Procedures," 35 Morbidity and Mortality Weekly Rep. 221-223 (1986).
[8] This conclusion reached by Day is supported by the reference to the Centers for Disease Control's, "Recommendations for Preventing Transmission of Infection with Human T-Lymphotropic Virus Type III/Lymphadenopathy-Associated Virus in the Workplace," 34 Morbidity and Mortality Weekly Rep., 681-686, 691-695 (1985), noted in recommendation no. 5:

Management of parenteral and mucous membrane exposures of HCWs. If a HCW has a parenteral (e.g., needlestick or cut) or mucous membrane (e.g., splash to the eye or mouth) exposure to blood or other body fluids, the source patient should be assessed clinically and epidemiologically to determine the likelihood of HTLV-III/LAV infection. If the assessment suggests that infection may exist, the patient should be informed of the incident and requested to consent to serologic testing for evidence of HTLV-III/LAV infection. If the source patient has AIDS or other evidence of HTLV-III/LAV infection, declines testing, or has a positive test, the HCW should be evaluated clinically and serologically for evidence of HTLV-III/LAV infection as soon as possible after the exposure, and, if seronegative, retested after 6 weeks and on a periodic basis thereafter (e.g., 3, 6, and 12 months following exposure) to determine if transmission has occurred. During this follow-up period, especially the first 6-12 weeks, when most infected persons are expected to seroconvert, exposed HCWs should receive counseling about the risk of infection and follow U.S. Public Health Service (PHS) recommendations for preventing transmission of AIDS (20, 21). [Emphasis supplied]
The same procedure applies with equal force to transmission from health care worker to patient.
Management of parenteral and mucous membrane exposures of patients. If a patient has a parenteral or mucous membrane exposure to blood or other body fluids of a HCW, the patient should be informed of the incident and the same procedure outlined above for exposures of HCWs to patients should be followed for both the source HCW and the potentially exposed patient. Management of this type of exposure will be addressed in more detail in the recommendations for HCWs who perform invasive procedures. [Id. at 684.]
[9] A court is bound by the state of medical science at the time of the relevant fact circumstances, not on future speculation. Cf. Doe v. Barrington, supra, 729 F. Supp. at 381; Ray v. School District of DeSoto County, 666 F. Supp. 1524, 1529 (M.D.Fla. 1987). Subsequent to this trial, a case of transmission from health care worker to patient was reported. Centers for Disease Control, "Possible Transmission of Human Immunodeficiency Virus to a Patient during an Invasive Dental Procedure," 39 Morbidity and Mortality Weekly Rep. 489 (1990); Mishu, "A Surgeon with AIDS," 264 J.A.M.A. 467 (1990).
[10] While McIntosh and Tarasoff dealt with the issue of psychotherapist/patient relations, the significance of the "duty to warn" is the subject of much discussion and debate among commentators in the context of both an HIV-positive and AIDS-positive patient. See, e.g., Hermann and Gagliano, "AIDS, Therapeutic Confidentiality, and Warning Third Parties," 48 Md.L.Rev. 55 (1989); Gostin, "Hospitals, Health Care Professionals, and AIDS: The "Right to Know" the Health Status of Professionals and Patients," 48 Md.L.Rev. 12 (1989); Comment, "Doctor-Patient Confidentiality versus Duty to Warn in the Context of AIDS Patients and Their Partners," 47 Md.L.Rev. 675 (1988); Note, "Between a Rock and a Hard Place: AIDS and the Conflicting Physician's Duties of Preventing Disease Transmission and Safeguarding Confidentiality," 76 Geo.L.J. 169 (1987).
[11] By amendments to N.J.S.A. 26:5C-1 et seq. (which became effective January 12, 1990), the Legislature recently addressed issues of confidentiality in the context of AIDS. N.J.S.A. 26:5C-1 et seq. provides that a health-care facility must maintain the confidentiality of the records of patients diagnosed with AIDS or HIV infection. Information contained in these records may be disclosed only upon written authorization of the patient, with limited exceptions. N.J.S.A. 26:5C-8(b)(3). These disclosure restrictions remain effective after the patient is discharged.
[12] The doctrine of informed consent will be discussed in greater detail, infra at 642-43, 592 A.2d at 1274.
[13] N.J.S.A. 10:5-4.1 states:

All of the provisions of the act to which this act is a supplement shall be construed to prohibit any unlawful discrimination against any person because such person is or has been at any time handicapped or any unlawful employment practice against such person, unless the nature and extent of the handicap reasonably precludes the performance of the particular employment.
[14] Plaintiff also asserts a cause of action under the LAD based on the breach of confidentiality occurring while plaintiff was a patient. See part III, supra, at 631-32, 592 A.2d at 1268. Plaintiff claims that because of the stigma attached to his condition, the medical center and staff treated the information differently, i.e., if plaintiff had been hospitalized for a less significant condition, the information would not have been disseminated in the same manner. Plaintiff has failed to establish a cause of action on this theory that plaintiff was treated differently. The different or discriminatory treatment was not to plaintiff. It was the information about plaintiff's condition that was treated differently. Plaintiff's medical records were dealt with in the same manner as any patient's medical records  an important factor in supporting plaintiff's claim for breach of confidentiality. Plaintiff can not now claim that such treatment which resulted in wide-spread dissemination of information forms the basis of a cause of action under N.J.S.A. 10:5-4 and -4.1.
[15] A peculiar anomaly in this case is that while the disclosure of plaintiff's medical condition and records is protected by the laws of confidentiality and privilege, once plaintiff assumes his role of surgeon, his medical condition must become known so that the issues of dealing with the "handicapped" surgeon can be appropriately resolved by both the surgeon and the medical center. Thus, a whole class of persons became privy to plaintiff's condition, not as a function of a breach of confidentiality, but because of their duties and obligations as persons charged with the responsibility of overseeing and, in some cases, regulating surgical privileges. This included the president of the medical and dental staff, chairman of the surgical department who was informed of the condition by plaintiff personally, president of the medical center and various other personnel in the decision-making process. No claim is made by plaintiff for these disclosures which, under some circumstances may be subject to a qualified privilege. See, e.g., Nanavati v. Burdette Tomlin Memorial Hosp., 107 N.J. 240, 526 A.2d 697 (1987).
[16] By letter of July 13, 1987, plaintiff wrote to the president of the medical and dental staff and said, inter alia:

I would appreciate it, if you are to hold a meeting to discuss me and my privileges, that you give me notice and an opportunity to appear before you to provide you with information which I believe will be relevant to your consideration.
Doody forwarded a letter to plaintiff on July 22, 1987, stating, inter alia:
[The president of the medical and dental staff] and I have been trying to arrange a meeting with you, but unfortunately you have been unable to do so. I am forwarding this information to you because it is important to your activities at the medical center, but I still would prefer a meeting.
The letter proceeded to outline the procedures to be followed by plaintiff, including monitoring and use of the special informed consent form. The meeting Doody had hoped to arrange never materialized. While plaintiff has placed in issue the substance of the medical center's decision, he has not raised any issue regarding the procedures utilized by the medical center in its decision-making process.
[17] Plaintiff also argues that the concept of informed consent has changed as Largey v. Rothman, supra, was decided in May 1988, and the relevant facts took place in June 1987. Under either the "prudent patient" standard as expressed in Largey, or the "reasonable physician" standard set forth in Kaplan v. Haines, 96 N.J. Super. 242, 232 A.2d 840. (App.Div. 1967), aff'd 51 N.J. 404, 241 A.2d 235 (1968), the requirement of disclosure would remain the same.
[18] This case does not involve nor will this court decide the issue of mandatory screening of physicians for HIV.
[19] In addition to the concept of "risk" as a relevant factor in the area of informed consent, the "duty to warn" imposed on a physician provides additional support to conclude that an HIV-positive surgeon is required to inform a patient of his HIV positivity before performing an invasive procedure. The physician's "duty to warn" third parties of dangers created by the physician's patients is recognized in New Jersey. McIntosh v. Milano, supra. So too, physicians have a duty to report to the department of health infectious diseases, N.J.S.A. 26:4-15, including PCP, N.J.A.C. 8:57-1.2. It has been strongly urged that this "duty to warn" extends to third parties associated with AIDS victims. See n. 10, supra. If a physician has a duty to warn third parties of the HIV status of patients who may be, for example, sexual partners of the patient, it could legitimately be argued that the risk of transmission would similarly require the surgeon to warn his own patients.
[20] While the chances of a patient acquiring HIV from an infected provider are small, infected patients have transmitted HIV to a dentist and other health-care providers when small or inapparent quantities of blood are transferred during clinical procedures. Presumably, small blood transfers from the provider to patient likewise could cause transmission. One infected surgeon may perform many operations, increasing the opportunity for transmission. As small as the risk to any individual patient may be, the aggregate risk thus becomes significant enough that patient safety and prudent risk management dictate restricting infected providers from performing invasive procedures. [Keyes, op. cit., supra at 601-602]